1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    RENEE JOHNSON MONROE,                No. 2:15-cv-02079-TLN-CKD

12              Plaintiff,

13        v.                               **FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW**
14    METROPOLITAN LIFE INSURANCE
      COMPANY, a New York corporation; and
15    DOES 1 to 10, inclusive,

16              Defendant.

17

18        Plaintiff Renee Monroe ("Plaintiff") is a Human Resources Compliance Specialist for

19   Kaiser Foundation Health Plan, Inc. ("Kaiser").  Plaintiff experienced significant low back pain in

20   February 2013 and was subsequently placed off work by her doctors.  In March 2013, Plaintiff

21   had an MRI which showed a diffuse disk bulge at the L5-S1 vertebral disc.  Plaintiff applied for

22   long term disability benefits available through her employer's insurer, Defendant Metropolitan

23   Life Insurance Company ("MetLife").  MetLife denied her claim finding she was not disabled

24   from working in her regular occupation as defined in its policy and upheld its decision in

25   subsequent appeals.  Plaintiff brought this action against Defendant pursuant to the Employment

26   Retirement Income Security Act ("ERISA").  This matter is before the Court on a bench trial

27   under Federal Rule of Civil Procedure 52.  The parties filed opening and responding trial briefs

28   (ECF Nos.  48–51) and requested the Court conduct the trial on "opening and responsive briefs,

                                              1

based upon the information contained in the Administrative Record and any other evidence the Court decides to admit in its discretion." (ECF No. 38 at 1–2.) The Court granted the parties' request and ordered the matter submitted on the papers without the presentation of witnesses. (ECF No. 52.)

The Court has carefully considered the parties' arguments, and hereby finds, for the reasons set forth below, that Plaintiff is disabled from working in her regular occupation as defined in the applicable policy.

## I.     FINDINGS OF FACT

### A.     Plaintiff's Occupation

1.     Plaintiff began working for Kaiser in 1995. (AR 283, 1645, 2181.)[1]

2.     At the time of the onset of her disability in March 2013, Plaintiff's job title was Human Resources Compliance Specialist. (AR 111, 233, 1641.) This position entailed substantial data entry, requiring Plaintiff to sit continuously for long periods at a computer, typically 98 percent of her eight-hour workday. (AR 111–13, 683–86, 1280, 1811.)

3.     Plaintiff's pre-disability earnings ("PDE") was $3,853.56 per month. (AR 2182–83.)

### B.     MetLife's Long-Term Disability Plan

4.     As an employee of Kaiser, Plaintiff enrolled in a long-term disability plan (the "Plan"). This Plan was funded by a group certificate of insurance (the "Policy") issued to Kaiser by MetLife. (AR 2288–2340.)

5.     Under the Plan, Plaintiff is entitled to long-term disability ("LTD") benefits if she is Totally or Partially Disabled. (*See* AR 2306–2312.)

6.     Benefits are payable after the employee has been disabled for 180 days, the Plan's "Elimination Period." (AR 2306, 2308, 2321.)

///

///

---

[1]     Defendant lodged the administrative record with the Court on April 5, 2018, documents bates-stamped AR 000001 through AR 002349.

2

7.     The Plan defines disability or disabled as: "that as a result of Sickness or injury You are either Totally Disabled or Partially Disabled." (AR 2311.) The Plan defines Totally Disabled or Total Disability as: "[d]uring the Elimination Period and the next 24 months, You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way." (*Id.*)

8.     "Usual Occupation" is defined as:

> any employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the employer when the Disability began. Usual Occupation is not necessarily limited to the specific job that You performed for the employer.

(AR 2312.)

9.     "Substantial and Material Acts" are defined as "the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified." (*Id.*)

10.     The Plan defines "proof" as "Written evidence satisfactory to Us[2] that a person has satisfied the conditions and requirements for any benefit described in this certificate." (AR 2309.) When a claim is made, "Proof must establish: the nature and extent of the loss or condition; [MetLife's] obligation to pay the claims; and the claimant's right to receive payment." (AR 2309–10.)

11.     The Plan requires that a claimant satisfy the 180-day Elimination Period, during which benefits are not payable. (AR 2306, 2308.) In order to satisfy the Elimination Period, the claimant must be continuously disabled for the entire period. (*see* AR 2308, 2311.) However, if the claimant returns to active work before completing the Elimination Period for 30 days or less, the claimant is not required to complete a new Elimination Period if he/she becomes disabled again due to the same or related sickness or accidental injury. (AR 2321.) Further, the days the claimant worked will count towards the completion of that Elimination Period. (*Id.*)

///

---

[2]     "Us" is defined to mean MetLife under the Policy. (AR 2310.)

3

12.     If a claimant who has completed the Elimination Period returns to work for six months or less and then becomes disabled again due to the same or related sickness or accidental injury, the claimant is not required to complete a new Elimination Period before receiving benefits.  (*Id.*)

13.     Defendant considered Plaintiff's Elimination Period to be from March 24, 2013 through September 20, 2013.  (AR 1280, 1286, 2027.)

14.     After 24 months, the definition of disability changes and requires the claimant to be unable "to engage with reasonable continuity in any occupation in which [the claimant] could reasonably be expected to perform satisfactorily in light of [the claimant's] age, education, training, experience, station in life, and physical and mental capacity…"  (AR 2311.)

15.     The Plan gives MetLife the right to "ask the insured to be examined by a Physician(s) of Our choice as often as is reasonably necessary to process the claim."  MetLife carries the responsibility to pay for these examinations.  (AR 2335.)

        C.     Plaintiff's Medical Records and LTD Claim

16.     Plaintiff has a history of chronic lower back pain dating back to February 2011.  (AR 739.)

17.     On February 13, 2013, Plaintiff fell while at work when her office chair "scooted back," causing her lumbar spasms and pain.  (*See* AR 1286, 1739–40, 2027.)

18.     As a result, on February 14, 2013, Plaintiff sought treatment at Kaiser from Dr. Jason Atienza ("Dr. Atienza") for pain in her lumbar spine.  (AR 956–59.)  Dr. Atienza diagnosed Plaintiff with a sprain or strain of the lumbar region and noted that she had a history of chronic low back pain.  (AR 956-57.)  Dr. Atienza recorded that Plaintiff felt sharp, continuous pain across her lumbar region and down both legs.  (AR 957.)  Dr. Atienza further noted objective findings that Plaintiff's gait was antalgic, she had difficulty getting up and down from the exam table, had limited flexion and extension, both right and left Straight Leg Raise test caused lumbar pain, and that heel/toe walking and squatting were painful.  (*Id.*)  Dr. Atienza referred Plaintiff to physical therapy and instructed her to continue taking the meloxicam and Percocet already prescribed by her primary care physician.  (AR 956–58.)  Dr. Atienza placed Plaintiff on

modified activity at work and home from February 26, 2013 to March 8, 2013 and indicated that she should be provided an ergonomic work station. (AR 1390.) In a doctor's note, Dr. Atienza indicated that Plaintiff was temporarily and totally disabled if she was not properly accommodated. (AR 723, 1390.)

19. Plaintiff attended three physical therapy sessions, on February 19, 2013, February 26, 2013, and March 7, 2013. (AR 960, 965, 981.) She treated with a Kaiser Workers' Compensation physical therapist, Amandeep Grewal, PT ("Grewal"), for complaints of constant, sharp pain in her low back rated at "7.5/10," which Plaintiff described felt like being "hit by a car." (AR 960–61.) Grewal performed objective lumbar range of motion tests, finding that Plaintiff's extension, rotation, and side bending were significantly limited due to pain. (AR 961.) Grewal performed the Straight Leg Raise test finding that Plaintiff had 75-degree flexion on the right and 80-degree flexion on the left. (AR 962.) Grewal repeatedly found that Plaintiff's "pain increase[d] with sitting" and that her long-term goal for Plaintiff to be able to "sit for 45 minutes" was "not achieved due to pain." (AR 963, 967, 983, 988.) Grewal consistently observed that Plaintiff was "guarded" with sitting and standing activities. (AR 962, 967, 983, 988.)

20. On February 22, 2013, Plaintiff had a phone consultation with Dr. Edgar Hse-Hwa Han ("Dr. Han") regarding her back pain. (AR 1473.) Plaintiff reported a significant flare-up of her lower back pain radiating down her right and left lower extremities as well as continued symptoms of numbness at the vaginal area. (*Id.*) Dr. Han ordered a lumbar spine MRI for possible lumbar radiculopathy. (*Id.*)

21. On March 1, 2013, Plaintiff returned to Dr. Atienza to follow up on her back injury. (AR 972–75.) By that time, Plaintiff's pain had increased, and she reported not being able to get to work on time due to her pain. (AR 973.) Dr. Atienza noted that Plaintiff's gait was antalgic, she had difficulty getting up and down from the exam table, and she had very limited flexion and extension of her lumbar spine. (*Id.*) Dr. Atienza indicated that Plaintiff could return to modified duty. (AR 724, 1392.) Plaintiff was restricted from stooping, squatting, lifting/carrying/pulling/pushing more than ten pounds, and was instructed to use an ergonomic chair. (AR 723–24.)

22. On March 13, 2013, John D. Warbritton III, M.D. ("Dr. Warbritton"), a board-certified orthopedic surgeon, examined Plaintiff, who rated her low back pain at 7.5/10. (AR 1324.) Dr. Warbritton made the following exam findings after performing objective tests:

- Decreased range of motion in the lumbar spine, including only 30-degree forward flexion when bending at the waist, 15-degree extension/bending backwards at the waist, and 15-degree right and left lateral flexion/side bending. (*Id.*)
- Decreased rotation in the lumbar spine of only 50 percent. (*Id.*)
- Decreased sensation in the right lower extremity. (*Id.*)
- Positive for pain in the right lower extremity with the seated Straight Leg Raise test. (*Id.*)
- Exaggerated lordosis (abnormal spine curvature in low back). (*Id.*)

Dr. Warbritton diagnosed Plaintiff with myositis (muscle inflammation), a lumbar sprain/strain, and degenerative disc disease. (*Id.*) He took Plaintiff off OxyContin because she reported it was "too sedating" and prescribed: Norco; Flector Patches; continued use of ice/heat and a transcutaneous electrical nerve stimulation ("TENS") unit for pain relief; and a return visit in four weeks. (*Id.*) Dr. Warbritton indicated that Plaintiff could return to work with modifications. (*Id.*) Specifically, that she could not perform repetitive bending, drive for more than one hour at a time, and should change positions. (*Id.*)

23. The MRI ordered by Dr. Han was performed on March 15, 2013. (AR 1496–98.) This MRI shows Plaintiff has mild diffuse disc bulges in her L3-L4 and L4-L5 intervertebral discs. (AR 1496.) This is a change from a previous MRI performed in 2011. (AR 1496, 1001–02.) The 2013 MRI also shows a large disc bulge in the right side of Plaintiff's L5-S1 intervertebral disc. The MRI report states:

> L5-S1: Diffuse disc bulge with right paracentral component, causing mild mass effect on the anterior thecal sac. With bilateral facet arthropathy, there is moderate right neural foramen encroachment at this level.

///

///

(AR 1496.)  This too is a deterioration since Plaintiff's previous 2011 MRI, which only showed mild degenerative disc disease, mild disc bulge at L5-S1, and facet arthritis.  (AR 1001–02.)

24.     Plaintiff submitted a claim to the State of California's Employment Development Department ("EDD") for California state disability benefits ("CASDI") and was approved to receive CASDI starting March 25, 2013.  (AR 1571, 1578, 1641.)

25.     Plaintiff returned to see Dr. Warbritton on March 25, 2013.  At that visit, Plaintiff rated her pain as 10/10.  (AR 1322.)  Dr. Warbritton diagnosed her with the same low back conditions and measured similar objective, abnormal range of motion limits, pain, and back spasms.  (*Id.*)  He determined Plaintiff needed an epidural steroid injection ("ESI") for her severe low back pain and radiculopathy into her lower extremities.  (*Id.*)  Dr. Warbritton did not note any information regarding Plaintiff's work status in his progress report.  (*Id.*)

26.     On March 29, 2013, Dr. Han reviewed the MRI results with Plaintiff.  (AR 995–1005.)  He confirmed the MRI shows a diffuse disc bulge at L5-S1 and correlated nerve encroachment.  (AR 1002.)  Dr. Han compared Plaintiff's 2011 MRI to her 2013 MRI and found she had "[m]ild degenerative change at L3-L5 levels…" (AR 1000.)  While he did not make specific mention of it, Dr. Han's progress notes show that where the 2011 MRI showed mild degenerative disc disease, mild disc bulge, and bilateral facet arthritis at L5-S1, the 2013 MRI shows a diffuse bulge with moderate right neural foramen encroachment at the L5-S1 location.  (AR 1000, 1002.)

27.     At the March 29, 2013 appointment, Dr. Han also performed other objective tests including the Straight Leg Raise test finding Plaintiff positive on the right leg at 45 degrees.  (AR 999.)  He also found that Plaintiff had marked range of motion limitation secondary to pain, decreased sensation to light touch and temperature in her right leg below the knee, tenderness to palpitation at her lower lumbar paraspinal muscles and gluteals, and that it was difficult to elicit reflexes at the Achilles tendon.  (*Id.*)

28.     Dr. Han diagnosed Plaintiff with lumbar radiculopathy, chronic low back pain, degeneration of lumbar or lumbosacral intervertebral disc, and arthropathy of lumbar facet.  (AR 995.)  He referred Plaintiff for a right L5-S1 ESI and recommended that she follow up with her

primary care physician regarding her "recent symptoms of urinary/bowel incontinence when she has severe episodes of her low back pain." (AR 995, 1003.) Dr. Han noted in taking Plaintiff's medical history that "prolonged sitting or driving" exacerbated her pain and that "lying down with pillows" alleviated it. (AR 996.) He noted that Dr. Warbritton gave Plaintiff permanent work sitting restrictions, that she was taking Norco, and recommended emergency department "immediate evaluation" if she had worsening radiating numbness. (AR 996, 1003.)

29. On April 10, 2013, Plaintiff returned to Dr. Warbritton for a follow up appointment. (AR 1321.) At this appointment, Dr. Warbritton noted Plaintiff had a slow, cautious, guarded gait, exaggerated lordosis, and was unable to heel/toe ambulate. (*Id.*) He performed a seated Straight Leg Raise test and found that she had a positive result on the right side at 90 degrees. (*Id.*) Dr. Warbritton listed Plaintiff's diagnoses as myositis, a sprain or strain of the lumbar spine, and degenerative disc disease. (*Id.*) Dr. Warbritton indicated that Plaintiff should remain out of work until May 17, 2013, pending a lumbar ESI. (*Id.*)

30. Plaintiff continued to treat with Dr. Warbritton. On May 17, 2013, Dr. Warbritton recorded that Plaintiff rated her pain 8/10. (AR 1320.) Dr. Warbritton found that Plaintiff had back spasms, decreased range of motion, and a positive Straight Leg Raise test on her right side. (*Id.*) He indicated Plaintiff needed an ESI "ASAP" and extended Plaintiff's time out of work until July 13, 2013. (*Id.*)

31. On May 20, 2013, after reviewing and comparing the 2011 and 2013 MRIs, Dr. Warbritton wrote a report to the Kaiser Foundation Hospital Health Plan, Sedgwick Claims Management Services. (AR 1329–30.) Dr. Warbritton opined that the 2013 MRI "revealed the progression of disk [sic] disease with a 'new pinched nerve.'" (AR 1329.) He indicated that, based on physical examination, Plaintiff had a right-sided L5-S1 radiculopathy and "urgently" required a lumbar epidural and anesthetic injection. (*Id.*) He noted that the L5-S1 right-sided protrusion, and possibly a bulge at L4-L5, were causing a compression of the exiting nerve roots. (AR 1330.) Dr. Warbritton stated that Plaintiff continued to be in significant pain and was out on temporary total disability. (*Id.*)

///

32.     On July 12, 2013, Dr. Warbritton met with Plaintiff and found she had spasms and decreased range of motion. (AR 1319.) Plaintiff reported her pain as 8.5/10. (*Id.*) Dr. Warbritton did not indicate any work status on his notes but instructed Plaintiff to return to the clinic on August 7, 2013. (*Id.*)

33.     On August 1, 2013, Kaiser employee Carol Hearron faxed a Disability Claim Employer Statement to MetLife, initiating Plaintiff's LTD claim. (AR 1640–42.) This form indicated that Plaintiff's last day worked was March 23, 2013 and listed an estimated return to work date as August 8, 2013.[3] (AR 1641.)

34.     On August 2, 2013, Dr. Warbritton wrote a special report per the request of attorney Jeffrey I. Fettner. (AR 282–85.) In this report, Dr. Warbritton reviewed a Panel Qualified Medical Evaluation ("QME") Report authored by Dr. Jacob Mathis ("Dr. Mathis"), an experienced neurosurgeon who performed a QME on Plaintiff.[4] (AR 282.) Dr. Warbritton's review indicates that Dr. Mathis "opin[ed] that the patient might require surgery and that a myelogram and repeat lumbar MRI is indicated." (AR 284.) Dr. Warbritton indicated that, in his own opinion, Plaintiff was temporarily partially disabled, would likely experience increased disability as a result of her injury, and required a lumbar ESI. (*Id.*) Dr. Warbritton further indicated he anticipated Plaintiff would need to go out on temporary disability. (*Id.*)

35.     On August 2, 2013, MetLife sent a letter to Plaintiff acknowledging receipt of her LTD claim and requesting additional information in support of the claim. (AR 1610–12.)

36.     At her appointment with Dr. Warbritton on August 7, 2013, Plaintiff reported her pain at 9/10. (AR 1318.) Dr. Warbritton found Plaintiff positive for spasm, that she had a decreased range of motion, and that she needed an ESI. (*Id.*) Dr. Warbritton again extended Plaintiff's time off work until September 19, 2013. (*Id.*)

37.     On August 12, 2013, MetLife sent Plaintiff another letter, confirming the receipt of her LTD claim. (AR 1580–82.)

---

[3]     There is no evidence in the record that Plaintiff returned to work at any time during the elimination period.

[4]     The actual QME report is not included in the administrative record.

38.     On August 23, 2013, Plaintiff called MetLife and informed them that she was not interested in pursuing her LTD claim.  (AR 1579.)

39.     On August 27, 2013, MetLife sent Plaintiff a letter confirming that they closed her claim per her request.  (*Id.*)

40.     Plaintiff next saw Dr. Warbritton on September 4, 2013.  (AR 1317.)  At that appointment, Dr. Warbritton continued to note symptoms such as exaggerated lordosis, poor body mechanics, limited range of motion, and a positive Straight Leg Raise test on her right side.  (*Id.*)  He indicated that Plaintiff should remain off work until her next appointment, four to six weeks later.  (*Id.*)

41.     Despite Dr. Warbritton's recommendation for a next appointment four to six weeks out, Plaintiff returned for a follow-up visit on September 18, 2013.  (AR 1573–76.)  At that appointment, Dr. Warbritton filled out the Attending Physician Statement form provided by MetLife.  (*Id.*)  He indicated Plaintiff's diagnosis included issues with her back and referenced the attached progress notes.  (AR 1573.)  On this form, Dr. Warbritton confirmed that Plaintiff was to remain off work until October 14, 2013.  (AR 1574.)

42.     On October 1, 2013, Plaintiff saw Dr. Randal Tom ("Dr. Tom") for pain in the back of her left heel.  (AR 1043–45, 1529–31.)  Dr. Tom diagnosed Plaintiff with Achilles tendinitis.  (AR 1043, 1529.)  Dr. Tom noted that Plaintiff reported she had been experiencing this pain for one to two months.  (*Id.*)  Dr. Tom prescribed the use of a controlled ankle motion ("CAM") walker for her left foot for three to four weeks.  (AR 1044, 1530.)

43.     On October 14, 2013, MetLife received a fax with a partial employee statement.  (AR 1663.)  MetLife thereafter attempted to contact Plaintiff to confirm whether she wanted to pursue her LTD claim.  (AR 1663–64.)

44.     Plaintiff returned to Dr. Tom on October 30, 2013.  (AR 1048–50, 1534–36.)  She reported minimal improvement with use of the CAM walker and pain when she stood or walked.  (AR 1048, 1534.)  Dr. Tom prescribed Plaintiff a "BK cast" (a hard, plaster cast placed below the knee) for her left foot and instructed her to return in three weeks.  (AR 1049–50, 1535.)

45.     On November 7, 2013, MetLife was able to contact Plaintiff over the phone and she confirmed that she wished to pursue her LTD claim.  (AR 1664–65.)

46.     On November 20, 2013, Plaintiff had her BK cast removed.  (AR 1051, 1537.)  Dr. Tom noted that Plaintiff experienced marked improvement with the hard cast and instructed her to return to the CAM walker for one to two weeks and then progress to supportive shoes as tolerated.  (AR 1051–52, 1537– 38.)

47.     On December 5, 2013, MetLife requested Plaintiff's medical records from Kaiser.  (AR 1553.)

48.     On January 10, 2014, Plaintiff saw Dr. Tom for her left heel pain.  (AR 1075–78.)  Dr. Tom noted that Plaintiff experienced improvement after three weeks in a hard cast and had returned to a CAM walker and then shoes.  (AR 1076.)  She had been able to walk with just supportive shoes for five days before experiencing a return of her pain.  (*Id.*)  Dr. Tom again proscribed a BK cast for Plaintiff.  (AR 1077.)

49.     On January 10, 2014, Plaintiff had a phone interview with MetLife employee Mia Cornelius regarding her current medical status, work history, and ability to work and do household chores.  (AR 1699–1710.)

50.     **Medical Record Review by Nurse Consultant Rebecca Bachner:** On January 14, 2014, MetLife Nurse Consultant Rebecca Bachner ("Nurse Bachner") reviewed Plaintiff's medical records.  (AR 1710–19.)  She reviewed Dr. Warbritton's notes from Plaintiff's visits on September 18, 2013, and September 4, 2013 (AR 1710–11); a work status report from Dr. Craig Boulris from July 16, 2012 (AR 1711–14); notes from Dr. Adair from July 2, 2012 (AR 1714–17); and Dr. Han's notes from March 31, 2013, including his notes regarding the March 15, 2013 MRI (AR 1717–19).

51.     Nurse Bachner drafted a Clinical Assessment Form on January 15, 2014, finding that Plaintiff's primary diagnosis was muscle facia issues with the co-morbid conditions of Achilles tendinitis and lumbar radiculopathy.  (AR 1719–21.)  Nurse Bachner's summary focused mostly on Plaintiff's shoulder issues in 2012, but noted Plaintiff had problems with her low back from July 17, 2012 through March 23, 2013.  (AR 1720.)  The rational for referral included

Plaintiff's statement that she would be having an ESI in her back on January 8, 2014 and would be placed in a hard cast a week or two later. (AR 1721.) The Clinical Assessment Form indicates that "Cms [sic] is unsure of if her symptoms exhibited a severity to preclude [employee] from performing sedentary and or light activities from ddc to present." (AR 1721.)

52. On January 17, 2014, Plaintiff went to see Dr. Warbritton for a consultation. (AR 275–80.) Dr. Warbritton wrote a "medicolegal" report based on this visit. (*Id.*) In his report, he confirmed Plaintiff's history of back pain and diagnosed her with single- or double-sided lumbar radiculopathy, progressive degenerative disc disease at L5-S1, and nerve damage. (AR 278.) Dr. Warbritton indicated that Plaintiff would need up to two lumbar steroid injections per year for her pain. (AR 277.)

53. Plaintiff saw Dr. Tom on January 24, 2014, for pain in her left heel. (AR 1081–84.) Dr. Tom recommended that Plaintiff return to wearing the CAM walker for one to two weeks and then progress to supportive shoes. (AR 1083.)

54. Plaintiff returned to work on February 18, 2014. (AR 1794, 1850.)

55. On February 19, 2014, Dr. Tom put Plaintiff on modified activity at work, limiting her from standing or walking more than five minutes in an hour. (AR 727.)

56. On March 14, 2014, Tanja Simone Frey, M.D. ("Dr. Frey"), a Kaiser anesthesiologist/pain management physician, gave Plaintiff a lumbar ESI on the right side at L5-S1 for her chronic, severe low back pain, after diagnosing her with degeneration of lumbar intervertebral disc. (AR 1096–97, 1175, 1222.)

57. Dr. Frey placed Plaintiff off work, noting the reason for her absence as "post surgery" and Plaintiff's diagnosis as "[history] of lumbar epidural steroid injection." (AR 728.)

58. On March 17, 2014, Dr. Meiling Chiang ("Dr. Chiang"), Plaintiff's primary care physician at Kaiser, put Plaintiff off work for the day. (AR 729.)

59. Nurse Bachner reviewed additional medical records from Dr. Warbritton on March 18, 2014. (AR 1737–40.) These records included Dr. Warbritton's notes from Plaintiff's visits on: September 4, 2013; August 7, 2013; July 12, 2013; March 17, 2013; April 10, 2013; March 25, 2013; March 13, 2013; and March 20, 2013. (*Id.*)

60. On March 18, 2014, Nurse Bachner completed a task titled "Action Plan – Clinical." (AR 1740–44.) In the Action Plan, Nurse Bachner noted Plaintiff had "mild degenerative changes at L3-L5" and that next steps include clarifying if Plaintiff has work functionality. (AR 1742.) Nurse Bachner also completed a Re-Assessment. (AR 1744–46.) This Re-Assessment closely matched the assessment completed on January 15, 2014. (*compare* AR 1740–44 and AR 1744–46.)

61. On March 24, 2014, Plaintiff had a follow up appointment with Dr. Tom for her left foot. (AR 1102–04.) Plaintiff reported that she had pain with increased walking and returned to using the CAM walker for eight days with "significant resolution of pain and swelling." (AR 1102.) Dr. Tom recommended Plaintiff continue to wear the CAM walker daily for two weeks, with progression to supportive shoes, as tolerated. (AR 1104.)

62. On April 7, 2014, Nurse Bachner called Dr. Warbritton's office. (AR 1748.) Nurse Bachner spoke with an employee named "Nate," who informed her that Plaintiff was advised to continue off work until January 2014, but Nate was unsure whether Plaintiff continued to be off work. (*Id.*) Nurse Bachner also sent a letter to Dr. Warbritton's office requesting information regarding Plaintiff's ability to perform her sedentary job duties. (AR 1292.)

63. On April 22, 2014, Nurse Bachner completed another "Action Plan – Clinical." (AR 1749–53.) Nurse Bachner indicated that she had attempted to clarify Plaintiff's functionality with Dr. Warbritton but was unsuccessful. (AR 1752.) Under "Next Steps," Nurse Bachner indicated that "medical does not support ongoing functional limitations." (*Id.*)

64. On April 28, 2014, MetLife employee Mia Cornelius completed a task titled "Clinical Response to Case Manager." (AR 1753–59.) In the "Comment" section, it was noted that "[s]ubmitted medical does not support [Plaintiff's] inability to perform her job duties from DOD through LTD BSD and forward" (AR 1754) and "[a]lthough [Plaintiff's] exams did reveal some positive findings there is a lack of significant diagnostic test results and lack of significant treatment to support ongoing functional limitations." (AR 1756.)

///

///

65. **MetLife denies Plaintiff's LTD claim:** On May 2, 2014, MetLife sent Plaintiff notice of the denial of her LTD claim. (AR 1284–89.) In its denial letter, MetLife reviewed its findings from Plaintiff's medical records. It found:

- Plaintiff exhibited limited range of motion in her lumbar spine, tenderness in the para spinal area, and pain resulting from a Straight Leg Raise test on February 14, 2013. (AR 1286–87.)

- Plaintiff's March 15, 2013 MRI indicated mild degenerative changes at L3-L5. (AR 1287.) However, notably, the denial letter does not mention the L5-S1 diffuse disc bulge also noted in Plaintiff's 2013 MRI. (See AR 1284–89, 1496.)

- Plaintiff exhibited a positive Straight Leg Raise test in her right side at her March 31, 2013 appointment with Dr. Han and was given an L5-S1 ESI as treatment for her low back pain. (AR 1287.)

- Plaintiff was treated for left heel pain by Dr. Tom with a CAM walker and then a below-the-knee cast. (*Id.*)

- Dr. Warbritton took Plaintiff off work and recommended she cease work at her usual occupation. (AR 1287–88.) He also recorded positive Straight Leg Raise tests at numerous visits. (*Id.*)

However, despite these findings, MetLife determined that there were insufficient records of significant diagnostic test results and treatment to conclude that Plaintiff was unable to perform her usual occupation of HR Compliance Specialist. (AR 1288.) On this basis, MetLife denied Plaintiff's LTD claim. (AR 1284–89.)

66. On May 12, 2014, Dr. Warbritton provided a "Supplemental Primary Treating Physician's Report" to attorneys involved in Plaintiff's various Workers' Compensation claims. (AR 271–73, 1947–49.) In the report, he again confirmed Plaintiff had radiculopathy and continued to need two lumbar ESIs per year for her radiculopathy, radiating leg pain, and back pain. (AR 272, 1948.)

///

///

67. On May 22, 2014, Plaintiff saw Dr. Tom for Achilles tendonitis. (AR 1117–19.) Plaintiff reported returning pain and swelling after having the hard cast removed two weeks prior. (AR 1117.) She experienced a 75 percent improvement with the hard cast but returning to the CAM walker did not resolve her returned swelling or pain. (*Id.*) Dr. Tom prescribed Plaintiff a hard cast again and instructed her to return after three weeks to have it removed. (AR 1118–19.) Dr. Tom also put Plaintiff on modified activity at work from May 22, 2014 through July 22, 2014, limiting her from standing and walking more than ten minutes in an hour. (AR 730.)

68. On June 12, 2014, Dr. Tom treated Plaintiff for her Achilles tendinitis. (AR 1122–24.) Dr. Tom prescribed the continued use of a CAM walker for one to two weeks. (AR 1124.)

69. Plaintiff saw Dr. Manorie Ekanayake ("Dr. Ekanayake") on August 7, 2014, for right knee joint pain and left ankle joint pain. (AR 1129–33.) Plaintiff arrived at the appointment in a wheel chair. (AR 1130.) Plaintiff requested a doctor's note until her normal physician returned from vacation. (*Id.*) Dr. Ekanayake noted that Plaintiff was unable to walk and was on pain medication. (*Id.*) Dr. Ekanayake put Plaintiff off work from August 7, 2014 to August 11, 2014. (AR 731.)

70. Plaintiff ceased work on August 8, 2014, due to her medical conditions. (AR 1794, 1850, 2189–90.)

71. Plaintiff did not return to work after August 8, 2014. She applied for disability benefits from EDD and was approved for CASDI, effective August 8, 2014. (AR 264–65, 1793–94, 1869, 2000–04, 2012, 2175–76.)

72. On August 15, 2014, Plaintiff saw Dr. Troy Douglas ("Dr. Douglas"), a podiatrist, for heel pain. (AR 1137–40.) Dr. Douglas noted Plaintiff had significant equinus and dorsalflexion barely to neutral. (AR 1139.) His assessment was that Plaintiff had chronic tendonitis in her left ankle and mild plantar fasciitis symptoms. (*Id.*) Dr. Douglas ordered an MRI, noted that Plaintiff's nerve symptoms were likely from her low back problems, and advised her to follow up with her medical doctor. (AR 1140.)

73. On August 27, 2014, Plaintiff reported severe ankle pain to Dr. Chiang over the phone. (AR 1141–44.)

74. On August 28, 2014, Plaintiff saw Dr. Tom to follow up on her ankle pain. (AR 1145.) Dr. Tom diagnosed Plaintiff with left Achilles tendon strain and left calf pain. (*Id.*) Plaintiff reported that she had some pain relief from the hard cast and estimated that she improved 75 percent. (AR 1146.) Dr. Tom advised that Plaintiff continue to use her CAM walker for one to two weeks and progress to supportive athletic shoes, as tolerated. (AR 1147.)

75. On September 5, 2014, Plaintiff had an MRI performed on her left ankle. (AR 1183.)

76. On September 11, 2014, Dr. Douglas called Plaintiff to discuss her left ankle MRI. (AR 1151.) He indicated that no significant damage was seen and there was nothing to suggest any significant injury or other problems. (*Id.*) He did see "[m]ild increased signal in distal achilles [sic] consistent with some tendinopathy" and mild fluid in Plaintiff's other flexor tendons. (*Id.*) Dr. Douglas advised Plaintiff to continue stretching her Achilles tendon and be sure to wear supportive tennis shoes with arch support. (*Id.*)

77. Dr. Warbritton wrote an additional "Special Supplemental Report" for the Workers' Compensation process on November 10, 2014. (AR 267–69, 1943–45.) In it, he opined that he no longer wished to provide medicolegal opinions in the Worker's Compensation process because, as he had treated Plaintiff for 10–15 years, he may not be able to be impartial. (AR 268, 1944.) He specifically did not want to treat Plaintiff for the left knee injury in question in that matter. (*Id.*) Dr. Warbritton also suggested that a "qualified Agreed Medical Evaluator" be retained to examine Plaintiff. (*Id.*)

78. On November 11, 2014, Plaintiff saw Dr. Han for her back. (AR 1158–69.) Plaintiff reported a 65 percent improvement after her March 14, 2014 ESI, but her pain returned to baseline after five months. (AR 1160.) At this appointment, Plaintiff's pain was in her lower back area, radiating to the bilateral buttocks and down the right posterior thigh and calf distally to the dorsum of her right foot and into her right third- through fifth-toe. (*Id.*) Plaintiff had a positive Straight Leg Raise test on her right side at 45 degrees. (AR 1162–63.) Dr. Han noted that Plaintiff had continued symptoms consistent with right L5-S1 radiculopathy. (AR 1165.) Dr. Han indicated that "[o]n my review of the patient's history, physical examination, and

imaging studies, there is no medical indication for time off work or modified duties." (AR 1167.) However, Dr. Han did prescribe Plaintiff an additional ESI injection and instructed her how to schedule it. (*Id.*)

79.     On November 14, 2014, Plaintiff saw Dr. Chiang for her low back pain. (AR 1170–73.) At this appointment, Plaintiff reported that her low back pain was bad and that she was expecting to get another ESI. (AR 1170.) Plaintiff also stated she wanted to keep working until retirement but had to take Norco for her pain, which made her unable to concentrate on her work. (*Id.*)

80.     On December 3, 2014, Plaintiff saw Dr. Tom for tendinitis of her left Achilles tendon. (AR 1181–84.) At this visit, Dr. Tom reviewed the MRI on Plaintiff's left ankle. (AR 1183.) He noted "mild edema in the distal Achilles tendon suggesting tendinopathy/mild partial tearing." (*Id.*) Dr. Tom put Plaintiff on modified duty at work and home from December 3, 2014 to January 30, 2015. (AR 734.)

81.     On December 4, 2014, Dr. Frey consulted with Plaintiff for the repeat ESI after diagnosing her with chronic low back pain, lumbosacral radiculopathy, and recording that Plaintiff's low back pain, at 7/10, was aching, sharp and radiating to both legs. (AR 1185–90.) Dr. Frey reviewed Plaintiff's March 2013 lumbar spine MRI and agreed it showed a diffuse disc bulge and correlated nerve root impingement at L5-S1, as well as other milder disc bulges along Plaintiff's lumbar spine. (*Id.*)

82.     Dr. Frey rescheduled the ESI, however, because Plaintiff was in a head-on motor vehicle collision in December 2014. (AR 1249.)

83.     Dr. Chiang saw Plaintiff on December 8, 2014, for her ongoing, chronic, low back pain and left plantar fasciitis. (AR 1197–1202.) Dr. Chiang noted Plaintiff felt severe pain in her left heel when standing and was "recommended to have left heel surgery." (AR 1198.) Dr. Chiang observed that Plaintiff needed assistance to get up from her wheelchair and needed a cane to support her to stand. (AR 1201.) Dr. Chiang put Plaintiff off work from December 8, 2014 to January 9, 2015. (AR 735.)

///

84.     On December 8, 2014, Plaintiff filed a new LTD claim with MetLife.  (AR 2175–79.)  In this claim, Plaintiff indicated her last day worked was July 23, 2014, and stated that her chronic lower back pain, plantar fasciitis in her right foot, and right hip pain prevented her from working.  (AR 2177.)

85.     Dr. Warbritton wrote a "Special Supplemental Report" on December 8, 2014, in the Workers' Compensation matter.  (AR 263–65, 1939–41.)  In a letter provided to the attorneys with his report, Dr. Warbritton informed the attorneys that he sold his medical practice and was no longer treating patients but would continue performing medicolegal work into the indefinite future.  (AR 263, 1939.)  Dr. Warbritton again recommended that an agreed upon Qualified Medical Examiner be appointed.  (AR 264, 1940.)  He indicated that Plaintiff experienced progressive physical incapacity and that she was scheduled for surgery on December 10, 2014, for an endoscopic plantar fasciotomy and excision of a heel spur.  (*Id.*)  Dr. Warbritton stated that Plaintiff had been using a CAM boot for the past 14 months for pain in her foot.  (*Id.*)  He also stated that, as Plaintiff's treating physician for "more years than [his] daughter has been alive," he did not believe he could be impartial to the extent he demands of himself.  (*Id.*)

86.     In mid-December 2014, Plaintiff was involved in a motor vehicle accident.  (AR 1206)

87.     After her motor vehicle accident, Plaintiff went to Kaiser in Pleasanton and saw Dr. Alexander Lippert ("Dr. Lippert") on December 15, 2014.  (AR 703–13, 1205–16.)  Plaintiff was diagnosed with a right shoulder sprain, whiplash injury of the neck, thoracic spine sprain, lumbar spine sprain, hematoma, chest wall contusion, left knee medial collateral ligament sprain, left wrist sprain, right wrist sprain, scalp contusion, closed head injury, right great toe sprain, concussion, and impingement syndrome of her right shoulder.  (AR 1205–06.)  Dr. Lippert put Plaintiff off work from December 15, 2014 to December 25, 2014.  (AR 736.)

88.     Plaintiff saw Dr. Inna Tarasula ("Dr. Tarasula") on December 17, 2014, for a traumatic right breast hematoma she sustained as a result of her motor vehicle accident.  (AR 1217–20.)

///

89.     On December 19, 2014, Dr. Travis Sautter ("Dr. Sautter"), a Kaiser doctor, saw Plaintiff for left heel pain.  (AR 1221.)  He noted that Plaintiff's condition was chronic, and Plaintiff had already gone through "extensive conservative treatment" and was requesting surgery.  (*Id.*)

90.     **December 23, 2014, interview with MetLife Employee Catherine Bruce:** MetLife employee Catherine Bruce ("Bruce") conducted a phone interview with Plaintiff on December 23, 2014.  (AR 2190–2205.)  In that call, Plaintiff reported the following:

- Plaintiff was currently receiving state disability benefits.  (AR 2195.)
- Plaintiff had Workers' Compensation claims for cumulative trauma, chronic pain in lower back, bilateral knee injuries, radiating pain down her left leg, pinched nerve, and plantar fasciitis in her left foot.  (AR 2196.)
- Plaintiff was awaiting surgery for her plantar fasciitis.  (*Id.*)
- Plaintiff was waiting for an ESI in her back.  (*Id.*)
- On December 13, 2014, Plaintiff was involved in a car accident and sustained a concussion, contusions to her chest/breast, was unable to move her right shoulder, possible fracture in right and left wrists, swollen hands, difficulty bending her knees, and sprained right big and middle toes.  (AR 2196–97.)
- Plaintiff's then-current symptoms included: severe pain in right and left wrists, right foot big toe, both knees, swelling, constant pain, ringing in ears, blurriness, and headache.  (AR 2199–2200.)
- Plaintiff was taking Norco and ibuprofen 800 and experienced side effects making her feel like she was in a different state of mind, her memory was unclear, and her process of thinking was not clear.  (AR 2200.)
- Plaintiff reported that before the car accident she was not allowed to walk around, but used a motorized scooter, used a cane to lift herself from bed, and needed assistance with bathing, grooming, and dressing.  Plaintiff could not do chores such as making the bed, cooking, or navigating stairs.  (AR 2200–01.)

///

- Plaintiff had applied for Social Security Disability Insurance benefits ("SSDI"). (AR 2203.)
- Plaintiff was unsure if she would be able to return to work, but any efforts to do so could not begin until after surgery on her foot for plantar fasciitis. (AR 2203–04.)

91.     On January 8, 2015, Dr. Chiang placed Plaintiff off work from January 9, 2015 through March 26, 2015, due to Plaintiff's chronic low back pain and Achilles tendon tear. (AR 1262.)

92.     On January 13, 2015, MetLife informed Plaintiff in a phone call that she was not eligible to file a new claim, but instead had to appeal her claim denied on May 2, 2014, because she never returned to work in the usual and customary way. (AR 2250–53.) The same day, MetLife followed up on this call by sending Plaintiff a letter which directed her to file an appeal if she desired to reopen her previous claim. (AR 260–61.)

93.     On January 18, 2015, Dr. Lippert, the doctor who treated Plaintiff after her car accident, evaluated Plaintiff and deemed her able to return to work at full capacity on that date. (AR 737.)

94.     On January 29, 2015, Plaintiff sent a letter to MetLife requesting an appeal of her claim. (AR 258–59.)

95.     On February 3, 2015, MetLife sent Plaintiff a letter in which it acknowledged receipt of her appeal request and stated her claim had been referred for an independent claim review. (AR 253.)

96.     **Dr. Chiang's Disability Impairment Questionnaire:** Dr. Chiang filled out a Disability Impairment Questionnaire for MetLife on February 5, 2015. (AR 238–42, 246–50.) Dr. Chiang indicated Plaintiff's diagnoses were: chronic low back pain; chronic bilateral shoulder surgery; surgery on left shoulder; plantar fasciitis in both feet; left Achilles tendon tear; depression; strain in both wrists; concussion; and neck muscle strain. (AR 246.) Dr. Chiang expected Plaintiff's impairments to last at least 12 more months and did not believe Plaintiff to be a malingerer. (*Id.*) Plaintiff's primary symptoms were listed as: constant low back pain; heel pain; and inability to walk. (AR 239, 247.) Her pain was characterized as throbbing with muscle

spasms in her low back, shoulder, wrists, and feet on a daily or constant basis.  (*Id.*)  Dr. Chiang noted that movement, standing, and sitting aggravated Plaintiff's pain and leg numbness.  (*Id.*)  Plaintiff's medications included: Norco, which made her sleepy; ibuprofen, which upset her stomach; and Zoloft, for depression.  (*Id.*)  Dr. Chiang believed these to be the medications which caused the least severe side effects for Plaintiff, as Dr. Chiang had previously prescribed various other pain medications to Plaintiff which all resulted in more severe side effects.  (*Id.*)  In this Questionnaire, Dr. Chiang concluded that from at least August 7, 2014 through February 5, 2016:[5]

- Plaintiff could perform a job in a seated position for two hours total, at most, in an eight-hour workday.  (AR 240, 248.)

- Plaintiff could perform work while standing for less than one hour per eight-hour work day (*Id.*)

- It was medically necessary for Plaintiff to avoid continuous sitting during the workday.  (*Id.*)

- Plaintiff could not sit for longer than 15 to 20 minutes at a time without severe pain requiring her to lay down and rest.  (*Id.*)

- Plaintiff was unable to stand up and move around to relieve her pain, but instead needed to lay down.  (*Id.*)

- Plaintiff needed to have both her legs raised to waist level as often as possible to decrease foot swelling.  (*Id.*)

- Plaintiff wore wrist splints and had significant limitations on her ability to grasp, handle, or reach, and should do these actions never/rarely to occasionally.  (AR 241, 249.)

- Plaintiff's symptoms were likely to increase in a competitive work environment.  (*Id.*)

---

[5]     It is unclear from the record who inserted the August 7, 2014 date indicated on the Disability Impairment Questionnaire.  (*See* AR 242 (question 14a).)  Dr. Chiang certified in another report that Plaintiff was continuously disabled from performing her own occupation from March 23, 2013, through the present.  (AR 53–55.)

- Plaintiff's symptoms, fatigue, and pain were severe enough to interfere with her concentration frequently during an eight-hour workday, from one to two-thirds of an eight-hour shift. (*Id.*)

- Plaintiff needed a one-hour rest break after 15 to 20 minutes of sitting and working. (*Id.*)

- Plaintiff was likely to be absent from work as a result of her impairments more than three times per month. (AR 242, 250.)

- Plaintiff's pain and suffering had caused her to become depressed. (*Id.*)

97. **Dr. Hinrichs's paper review and report:** Pursuant to MetLife's appeal procedures, MetLife sent Plaintiff's entire medical file to Independent Physician Consultant ("IPC") Mark Hinrichs, M.D. ("Dr. Hinrichs"), Board Certified in Internal Medicine and Physical Medicine and Rehabilitation, to be reviewed. (AR 232–36.) Dr. Hinrichs reviewed the medical records and authored a detailed report, dated February 25, 2015. (AR 224–31.) While conducting his review, Dr. Hinrichs did not speak with Plaintiff or any of her treating physicians. (AR 229.) The relevant information Dr. Hinrichs recorded in his summary of Plaintiff's medical records included the following:

- On October 28, 2003, MRI showed no lumbar disk protrusion. Plaintiff had mild facet joint arthropathy at L4-L5 and L5-S1. (AR 226.)

- On November 3, 2003, Plaintiff had a dramatic increase in low back pain and bowel and bladder incontinence and was placed on total temporary disability. The treating practitioner opined Plaintiff may have a new disk protrusion, but this was not proven by MRI. (*Id.*)

- The results of a December 16, 2010 EMG were consistent with early sensorimotor peripheral neuropathy, but showed no radiculopathy noted on EMG needle electrode examination. (AR 226, 331.)

- On January 17, 2010, "in spite of her normal EMG," Plaintiff was noted to have radiculopathy and permanent nerve damage. (AR 226.)

///

- On January 30, 2013, Plaintiff reported that her low back pain would come and go and was worse with lifting, but she had no lower extremity weakness. (AR 228, 952.)

- On February 14, 2013, Plaintiff's chronic low back pain was considered attributable to a nonindustrial condition, and it was believed she would benefit from an ergonomic chair. (AR 228, 958.)

- On March 15, 2013, MRI showed mild degenerative changes at L3 to L5. (AR 226, 1002.)

- On March 15, 2013, MRI showed "mild degenerative changes at L5-S1 with moderate neuroforaminal encroachment."[6] (AR 229.)

- On March 29, 2013, it is noted Plaintiff had a 15-year history of low back pain and left lower extremity pain, no stenosis, and no nerve root impingement. Plaintiff had bowel and bladder incontinence. She had some spondylosis and mild L5-S1 degenerative disk disease on an MRI of February 27, 2011. Her gait was normal.[7] (AR 228, 995–1005.)

- On March 30, 2013, Plaintiff underwent a right L5-S1 ESI. (AR 228.)

- October 1, 2013, Plaintiff had left heel pain, but normal manual motor testing. (AR 228, 1043–44.)

- On January 6, 2014, Plaintiff again underwent an ESI at right L5-S1. (AR 228.)

- On January 24, 2014, Plaintiff's left foot had marked improvement and no Achilles pain, but still a somewhat antalgic gait. (AR 228, 1082–83.)

///

---

[6]    Dr. Hinrichs' characterization of "mild degenerative changes" at the L5-S1 level does not address the diagnosis of a diffuse disc bulge with right paracentral component with bilateral facet arthropathy, as described in Plaintiff's medical records. (AR 229; *see also* AR 1496.)

[7]    This note only reviews the 2011 MRI, not the 2013 MRI. Additionally, Dr. Hinrichs omits notes by the treating doctor that Plaintiff was positive for back pain and positive for tingling and sensory change, she had a mild antalgic gait to the left, and had a positive Straight Leg Raise test on the right during this appointment. (AR 997, 999.)

- [On] March 24, 2014, Plaintiff's left heel was 75 percent improved but her pain was beginning to increase again.  (AR 228, 1102.)

- On June 12, 2014, Plaintiff's left heel was non-tender to palpation.  (AR 228, 1123.)

- On August 7, 2014, Plaintiff had a normal neuromuscular examination, except for wearing a CAM boot.  (AR 228, 1131.)

- On August 15, 2014, the examining practitioner recommended Plaintiff undergo a left ankle MRI.  (AR 228.)

- On August 28, 2014, Plaintiff's left heel was tender to palpation.  (AR 228.)

- On September 11, 2014, Plaintiff was felt to have no significant damage on MRI of the ankle, with only mild Achilles tendinopathy.  (AR 228, 1151.)

- On November 11, 2014, Plaintiff complained of low back pain radiating to bilateral glutes and right foot.  She had a mildly antalgic gait.  (AR 229, 1160–62.)

- On November 11, 2014, Dr. Han (physiatry) provided no medical indication for modification of work or remaining off work.  (AR 229, 1167.)

- On November 14, 2014, Plaintiff's treating physician recommended she undergo another ESI.  (AR 229.)

- On December 3, 2014, Plaintiff's left heel and Achilles were tender to palpation.  (*Id.*)

- On December 3, 2014, it was documented that Plaintiff could stand occasionally, walk occasionally, bend occasionally, not twist or climb ladders, and could lift, carry, push, and pull ten pounds.  (AR 226, 734.)

- On December 15, 2014, the examining practitioner believed Plaintiff could stand occasionally, walk occasionally, and bend occasionally, but could not participate in twisting, squatting, climbing, or reaching above the right shoulder level, and Plaintiff could not lift, carry, push, or pull objects weighing more than ten pounds.  (AR 227, 736.)

///

- On December 19, 2014, Plaintiff reported left heel pain and requested surgery, but (as noted by Dr. Sautter) she had no significant gait abnormality, and she had a full range of motion.  (AR 229, 1225–26.)

98.    Dr. Hinrichs acknowledged that the medical records did support *some* physical functional restrictions and limitations, but he determined that none of those would exceed the requirements of Plaintiff's usual, customary job duties, and he stated as follows:

> The medical record is supportive of physical impairment primarily for chronic low back pain and lumbar strain/sprain with lumbar spondylosis as well as plantar fasciitis.  It is appropriate with these conditions for [Plaintiff] to lift up to 10 pounds occasionally.  She may sit without restrictions.  She may stand for up to 30 minutes with a five-minute break to sit.  She may reach at waist level without restrictions.  She may reach above shoulder level rarely.  She may handle, finger, and feel without restrictions.  She may twist occasionally.  She may type without restrictions, use a phone without restrictions.  These restrictions would leave her able to undergo her usual, customary duties, as her job is primarily sitting and is documented to be sitting 98 percent of the day.

(AR 229–30.)

99.    On February 26, 2015, MetLife sent Dr. Hinrichs's report to Plaintiff's treating physicians, including Dr. Warbritton, Dr. Chiang, Dr. Tom and Dr. Sautter, and asked them to provide their comments, "specifically addressing but not limited to, [Plaintiff]'s impairments, restrictions and/or limitations." (AR 170–221.)  MetLife also asked those treating physicians, to the extent they disagreed with Dr. Hinrichs's report, to "submit clinical evidence in support of your conclusions." (*Id.*)  MetLife also sent a letter to Plaintiff, advising her that the IPC report was sent to her treating physicians and that a response was required by March 23, 2015. (AR 222–23.)

100.    Additionally, MetLife arranged for a Vocational Rehabilitation Consultant ("VRC") to review the file on February 27, 2015.  (AR 1839–41.)  The VRC identified the major duties of Plaintiff's own occupation as data entry and tracking of information, noted that her job entailed seven to eight hours per day of sitting, and confirmed that standing was not an essential function of her position.  (AR 1840–41.)  The VRC concluded that the restrictions and limitations determined by Dr. Heinrichs "would leave her able to undergo her usual, customary duties, as her

job is primarily sitting and is documented to be sitting 98 percent of the day." (AR 1840.)

101. On March 5, 2015, MetLife again sent copies of Dr. Hinrichs's report to Plaintiff's treating physicians, after Plaintiff reported that her physicians had not received it. (AR 130–168.)

102. Plaintiff advised MetLife that she had participated in an IME in connection with her claim for SSDI benefits. (AR 1848.) On March 20, 2015, MetLife requested that Plaintiff provide a copy of the SSDI report by March 30, 2015. However, the Social Security Administration ("SSA") would not release the report to Plaintiff or her attorney. (AR 129, 1848, 1850–52, 1857.)

103. On March 23, 2015, Plaintiff called MetLife and again requested that her claim since leaving work in August 2014 be considered a new claim beginning in August 2014. (AR 1850.) MetLife denied this request, informing Plaintiff that her original claim from March 2013 had been reopened. (AR 1850–51.)

104. On March 26, 2015, Plaintiff had foot surgery and was placed off work from March 26, 2015 through May 14, 2015, by Dr. Travis Sautter. (AR 21–22, 1261.)

105. As of March 30, 2015, none of Plaintiff's medical providers had responded to MetLife regarding Dr. Hinrichs's report. (AR 112.)

106. **MetLife denies Plaintiff's appeal of her claim:** On April 7, 2015, MetLife upheld its decision to deny Plaintiff's claim on appeal. (AR 1859–61.) It sent a letter to Plaintiff's attorney that day explaining its decision. (AR 109–14.) MetLife acknowledged that Plaintiff had some restrictions and limitations, but nevertheless determined those restrictions and limitations would not preclude Plaintiff's sedentary work for the following reasons:

> The IPC [Dr. Hinrichs] opined the clinical evidence contained in your client's claim file supported physical functional limitations due to chronic low back pain, lumbar strain/sprain with lumbar spondylosis, as well as, plantar fasciitis. The IPC indicated your client would have the following functional limitations:
>
> • lifting up to 10 lbs. occasionally;
>
> • standing up to 30 minutes with a 5 minute [sic] break to sit;
>
> • reaching above shoulder level rarely;
>
> • twisting occasionally; and

• no restrictions with sitting, reaching at waist level, typing, handling, fingering, feeling, and using a phone.

The IPC noted your client's job consisted of sitting up to 98% of the day and opined the above listed functional limitations would not prevent your client from performing the usual and customary duties of your client's job….

On appeal, we had a Vocational Rehabilitation Consultant (VRC) review the restrictions and limitations identified by the IPC to determine if your client could perform her Usual Occupation as of March 24, 2013. The VRC indicated your client's major job duties were data entry and tracking of information. The VRC noted your client was required to sit for 7-8 hours per day, and according to your client's job description, standing was not an essential function. The VRC opined while your client does have some restrictions and limitations, they would not exceed your client's job demands and would not prevent your client from performing her Usual Occupation as of March 24, 2013.

Based on a review of all medical documentation in your client's file, including everything submitted prior to your client's appeal, taking into consideration the opinion of your client's doctors, the opinion of the IPC and the opinion of the VRC we determined the clinical evidence contained in your client's claim file is insufficient to support physical functional limitations which would preclude your client from performing with reasonable continuity the Substantial and Material acts necessary to perform her own job which is part of her Usual Occupation in the usual and customary way. …

(AR 112–13.)

107. **Dr. Chiang's April 21, 2015, Opinion Letter:** On April 21, 2015, Dr. Chiang wrote a letter on behalf of Plaintiff indicating that Plaintiff suffered from low back pain, recently had left foot/heel surgery, was in a cast, and needed to be non-weight bearing for "another few weeks." (AR 88, 97.) Dr. Chiang also stated that Plaintiff could only sit for 20 minutes, but then had to lay down due to pain flare ups in her back. (*Id.*) Further, Plaintiff needed help to get out of her bed, could not stand by herself, could not use crutches because of her shoulder and wrist injuries, could not cook, take a shower on her own, or use the restroom without assistance. (*Id.*)

108. On April 30, 2015, Dr. Chiang filled out a Reasonable Accommodation Request Medical Certification for Kaiser human resources. (AR 32–33.) In it, she indicated that Plaintiff could not stand by herself and relied upon a wheelchair or scooter as she could not use crutches due to her shoulder injuries. (AR 32.) Plaintiff was expected to continue to have these

limitations for weeks or more and it was uncertain if she would be released to do her regular job duties without limitations. (AR 33.)

109. **Dr. Chiang's May 5, 2015 Opinion Letter:** Dr. Chiang wrote another opinion letter on May 5, 2015, in response to Dr. Heinrichs' report. (AR 66–68.) She indicated that she had not received Dr. Hinrichs's report before Plaintiff brought it to her on April 15, 2015. (AR 68.) In her letter, she confirmed that Plaintiff had been "continuously disabled since at least March 23, 2013 through the present due to chronic, debilitating low back pain. (AR 66.) According to Dr. Chiang, Plaintiff could not sit for longer than 15 to 20 minutes at a time without severe pain requiring her to lay down, could only perform a job in a seated position for two hours per day, but that those two hours could not be continuous, and Plaintiff would need a one-hour break to lay down after sitting for 20 minutes. (*Id.*) Dr. Chiang opined that it was medically necessary for Plaintiff to avoid continuous sitting during the work day. (*Id.*) Given that Plaintiff's job required sitting for 98 percent of an eight-hour day, it was Dr. Chiang's medical opinion that Plaintiff was unable to perform her job and would continue to be unable to perform her job into the future due to her debilitating chronic back pain. (*Id.*) Dr. Chiang listed Plaintiff's various diagnoses as including: chronic low back pain; lumbar radiculopathy; lumbar spondylosis; degeneration of her lumbosacral intervertebral disc; sprain/strain of lumbar region; and arthropathy of a lumbar facet. (*Id.*) Dr. Chiang indicated that Plaintiff's pain continued to be debilitating and radiated into "her buttocks and down her left and right legs causing numbness and tingling" and was so severe that Dr. Chiang prescribed Norco for pain management. (*Id.*) Dr. Chiang based her opinion on treating Plaintiff in person approximately three to five times per year since September 2010 and the following objective tests:

- March 15, 2013 MRI indicating diffuse disc bulge at L5-S1 with "right paracentral component, causing mild mass effect on the anterior thecal sac with bilateral facet arthropathy…" and moderate "right neural foramen encroachment…" (AR 67.)
- Plaintiff's multiple treatment with L5-S1 ESIs. (*Id.*)
- Difficulty getting up and down the exam table due to her back. (*Id.*)
- Multiple positive Straight Leg Raise tests. (*Id.*)

- Painful squatting.  (*Id.*)

- Zero percent range of motion for lumbar extension, only 25 percent rotation range and 25 percent side-bending range.  (*Id.*)

- An x-ray confirming lumbar facet arthropathy.  (*Id.*)

Dr. Chiang strongly disagreed with the opinion of Dr. Hinrichs that Plaintiff "may sit without restrictions" and work in her occupation as "manifestly and unequivocally untrue in [her] medical opinion based on treating the patient continuously for years."  (*Id.*)  Dr. Chiang explained that Dr. Hinrichs's opinion "ignores the substantial evidence in [Plaintiff's] medical records which demonstrate that she was, and continues to be, unable to work at her occupation" and was unsupported by the medical evidence.  (AR 66–67.)

110.    On May 11, 2015, Plaintiff's attorney forwarded Dr. Chiang's May 5, 2015 letter and the February 5, 2015 Disability Impairment Questionnaire to MetLife.  (AR 64–65.)

111.    On May 14, 2015, Dr. Chiang put Plaintiff off work until July 14, 2015.  (AR 31.)

112.    **<u>Dr. Hinrichs's supplemental report:</u>**  Dr. Chiang's opinion letter and Disability Impairment Questionnaire were forwarded to Dr. Hinrichs, who drafted a supplemental report on May 29, 2015.[8]  (AR 46, 48.)  In his supplemental report, Dr. Hinrichs stated:

> The enclosed records do not substantially change the opinion in the previously noted peer review.  Please note that [Plaintiff] has an essentially normal EMG and the MRI findings are notoriously poor at correlating with a patient's symptoms and mild disc bulges are not in and of themselves supportive objectively of impairment as a full one third of all adults age 65 and above have significant abnormalities on MRI without symptoms.

> Therefore, whereas I do not believe the medical information as presented is objectively supportive of impairment or restrictions, it would be appropriate to allow the claimant to sit for a half an hour at a time with a 5 minute [sic] break to stand and stretch for a total of 8 hours per 8 hour day.

(AR 48.)

///

///

_____

[8]    The supplemental report does not mention Plaintiff's inability to stand or address what limitations that may impose on her ability to work.  (*See* AR 46, 48.)

1   113.   On June 3, 2015, MetLife employee Jeremy Madore, an Appeals Specialist,

2   discussed Dr. Hinrichs's change in opinion regarding Plaintiff's need for accommodations to

3   perform her job with the "team."[9]  (AR 1877.)  Specifically, Mr. Madore noted that, before Dr.

4   Chiang's opinion letter and Disability Impairment Questionnaire were submitted, Dr. Hinrichs did

5   not believe Plaintiff needed any accommodations to perform her job; after, he indicated that

6   Plaintiff could sit for 30 minutes at a time with a five-minute break, up to eight hours per day.

7   (*Id.*)  Mr. Madore decided that Plaintiff was able to perform her own job.  (*Id.*)

8   114.   **MetLife confirms its denial of Plaintiff's claim:** On June 3, 2015, MetLife called

9   and sent a letter to Plaintiff's attorney indicating that, after a courtesy review, MetLife had not

10  changed its decision to deny Plaintiff LTD benefits.  (AR 41–42, 1878.)

11  115.   On June 23, 2015, MetLife determined that the additional information it received

12  regarding Plaintiff's disability did not warrant further consideration of her claim.  (AR 1880.)

13  MetLife sent a letter to Plaintiff's attorney expressing this decision.  (AR 14.)

14  116.   **The SSA Decision:**  At some point after Plaintiff ceased working in August 2014,

15  Plaintiff filed a claim for SSDI.  On September 29, 2017, Plaintiff received a fully favorable

16  decision from the SSA.  (ECF No. 42 at PLTF 79–94.)[10]  In its analysis, the SSA found:

17    • Plaintiff had not "engaged in substantial gainful activity since August 7, 2014.

18      (PLTF 85.)

19    • Plaintiff is "limited to standing-walking for less than two hours in an eight-hour

20      workday; is limited to lifting-carrying less than 10 pounds occasionally; cannot

21      climb, balance, stoop, kneel, crouch, and crawl; must take frequent unscheduled

22      breaks."  (PLTF 85–86.)

23    • Plaintiff is unable to perform any past relevant work.  (PLTF 88.)

24  ///

---

9    The record is unclear as to who was included in this team.
10   The parties filed a stipulation on December 28, 2017, agreeing to augment the
administrative record with documents relating to Plaintiff's SSDI claim.  (ECF No. 42.)  The
Court granted the parties' request.  (ECF No. 43.)  These documents are bates-stamped
PLTF000079-94.  The Court will reference these documents using the PLTF notation with the
relevant bates number, omitting superfluous zeros.

- Considering Plaintiff's "age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*)

- Plaintiff has been "under a disability as defined in the Social Security Act since August 7, 2014, the alleged onset date of disability." (PLTF 89.)

117. In reaching its determinations, the SSA performs a two-step analysis. First, the SSA must determine whether "there is an underlying medically determinable physical or mental impairment(s)" shown by "medically acceptable clinical or laboratory diagnostic techniques" that can "reasonably be expected to produce [Plaintiff's] pain or other symptoms." (PLTF 86.) Second, the SSA must "evaluate the intensity, persistence, and effects of the [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] work activities." (*Id.*)

118. In its first step, the SSA found Plaintiff's medical impairments as follows:

> The claimant's date of birth is August 7, 2014 [sic]. The longitudinal medical evidence clearly establishes a level of severity of the claimant's impairments to prohibit all substantial gainful activity. With regard to the claimant's lumbar degenerative disc disease, she has received epidural injections in the lumbar spine. Another treatment note indicated that the claimant has a 50 to 75 percent lumbar range of motion. An x-ray of the lumbar spine showed moderate mid and lower lumbar facets. The claimant's asthma requires her to use an inhaler. She has also been prescribed Montelukast. The claimant was noted to have left shoulder tendinitis and impingement syndrome along with osteoarthritis. Additionally, in 2012, the claimant had an arthroscopy with decompression. The claimant has left knee degenerative arthritis and she was noted to have creptus in her knee. She also has had surgery for a meniscus tear. The claimant was noted to have right plantar fasciitis. She had an unsuccessful foot surgery for plantar fasciitis in 2015. The claimant's depressive disorder was diagnosed in November 2008. It was described as major depression with recurrent episodes. She has been prescribed Paxil for this condition. The medical evidence supports a finding that the claimant is limited to a reduced range of sedentary work.

> …the claimant has a BMI of 34.9. Since obesity is defined by a BMI of 30 or greater, the claimant's BMI is consistent with obesity. The undersigned finds obesity to be a severe impairment and has considered the functional limitations resulting from the claimant's obesity in the claimant's residual functional capacity assessment.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. The

claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are reasonably consistent with the medical evidence and other evidence in the record…

(PLTF 86–87 (citations to SSA record omitted).)

119. In the second portion of the SSA's analysis, the SSA reviewed the opinions of each doctor who treated Plaintiff or reviewed her medical records and weighed the medical opinions contained therein in accordance with SSA regulations. (PLTF 87–88.) The SSA found:

Michael Cohn, Ph.D., a State agency consultative examiner, stated the claimant has moderate limitations in relating and interacting with the public; in maintaining concentration, attention, persistence, and pace; in associating with daily work activity; in maintaining regular attendance in the workplace and performing work activities on a consistent basis. The claimant is limited to mildly performing work activities without special or additional supervision.

Les P. Kalman, M.D., a State agency consultative examiner, stated that during his examination, the claimant exhibited impaired attention, concentration, and memory and because of her dysphoric mood, would not be able to withstand the stress of daily work activity. The doctor further noted that the claimant is able to understand, remember, and perform simple written and oral instructions. She is not able to maintain regular attendance in the workplace and perform work activities on a consistent basis. She is not able to perform work activities without special or additional supervision. She is not able to complete a normal workday or workweek without interruption. She is not able to accept instruction from supervisors and is not able to interact with coworkers and the public. She is not able to deal with the usual stresses encountered in competitive work.

The opinions of Dr. Kalman and Dr. Cohn are given great weight. The limitations noted by the doctors are well supported with specific references to medical evidence. The opinions are internally consistent as well as consistent with the evidence as a whole.

J. Herren, M.D., the claimant's treating doctor, stated the claimant is limited to lifting-carrying 20 pounds occasionally and 10 pounds frequently. She is limited to sitting, standing, and walking five hours intermittently. The claimant cannot climb, twist, or reach.

Mark Hinrichs, M.D., the claimant's treating doctor, stated the claimant is limited to lifting up to 10 pounds occasionally. She can stand for up to 30 minutes with a five-minute breaks [sic] to sit. She can reach at waist level without restrictions and she can reach above the shoulder level rarely. She can handle, finger, and feel without restrictions and can twist occasionally.

Meiling Chiang, M.D., the claimant's treating doctor, stated the claimant can sit for 20 minutes, but must be able to lie down. She

needs help getting out of bed. She cannot stand by herself and cannot walk even with crutches. She is unable to do many household chores. In another evaluation, the doctor stated the claimant can perform a job in a seated position for two hours and can only sit intermittently. She needs a one-hour break from sitting every 15 to 20 minutes before she can return to sitting. She frequently experiences severe enough back pain to interfere with her work while sitting.

Dr. Herren, Dr. Hinrichs,[11] and Dr. Chiang are treating physicians and their contemporaneous, longitudinal treating notes are consistent with the objective record as a whole and are supported by medically acceptable clinical and laboratory techniques.

(PLTF 87–88 (citations to SSA record omitted).)

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

1.      Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury … the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record … or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58."

2.      This Court has jurisdiction over Plaintiff's claims pursuant to ERISA. *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521 (9th Cir. 1985), quoting 29 U.S.C. § 1132(a)(1) ("ERISA creates a federal cause of action, with concurrent state and federal jurisdiction, over claims by an employee 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'").

3.      "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal citations and quotation marks omitted). "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place."

---

[11]     The SSA erroneously concluded that Dr. Hinrichs was Plaintiff's treating physician, rather than only a reviewing physician. As a result, the SSA gave as much weight to Dr. Hinrichs' opinion as it did Plaintiff's actual treating physicians. (*See* PLTF 88.)

1   *Id.* at 516–17 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

2       4.      The parties agree that the long-term disability plan at issue in this case is an

3   "employee welfare benefit plan" subject to ERISA. *See* 29 U.S.C. § 1002(1) (defining "employee

4   welfare benefit plan" and "welfare plan" to include "any plan, fund, or program … established or

5   maintained by an employer or by an employee organization, or by both, to the extent that such

6   plan, fund, or program was established or is maintained for the purpose of providing for its

7   participants or their beneficiaries, through the purchase of insurance or otherwise[] . . . benefits

8   in the event of sickness, accident, disability, death or unemployment.").

9       5.      "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de*

10  *novo* standard unless the benefit plan gives the administrator … discretionary authority to

11  determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

12  *Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[F]or a plan to alter the standard of review from the

13  default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide

14  discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th

15  Cir. 2006) (en banc) (italics added). However, California Insurance Code § 10110.6 ("§

16  10110.6") "voids any 'provision that reserves discretionary authority to the insurer, or an agent of

17  the insurer.'" *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625*,

18  856 F.3d 686, 695 (9th Cir. 2017), (citing § 10110.6(a)).

19      6.      This Court has already found that § 10110.6 applies to the Plan, voiding any

20  discretionary authority provisions. (ECF No. 37.) Thus, the appropriate standard of review

21  governing the challenge to Defendant's denial of Plaintiff's claim for long-term disability benefits

22  under ERISA is *de novo*. (*Id.*) For the reasons provided herein and upon conducting a *de novo*

23  review of the administrative record, the Court finds that Plaintiff is disabled. The Court expresses

24  no opinion as to whether it would have upheld MetLife's decision under an abuse of discretion

25  standard of review.

26      7.      "When conducting a de novo review of the record, the court does not give

27  deference to the claim administrator's decision, but rather determines in the first instance if the

28  claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz*

*v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (holding that under a *de novo* review, a district court evaluates "whether [the plaintiff] is disabled within the terms of the policy").

8.      Furthermore, in resolving cross-motions for judgment, the Court can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.  *Id.*

9.      This Court therefore does not examine whether MetLife's actions were reasonable. *Compare Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir. 2009), quoting *Sznewajas v. U.S. Bancorp Am. & Restated Supp. Benefits Plan*, 572 F.3d. 727, 734–35 (9th Cir. 2009) (holding that, under abuse of discretion standard, the plan administrator's decision can be upheld if it is "grounded on any reasonable basis."); *see also Conkright*, 559 U.S. at 521, quoting *Firestone*, 489 U.S. at 111 ("Applying a deferential standard of review … means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"). Rather, the Court will examine the facts in the first instance to determine whether Plaintiff is disabled.

10.     In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he or she was disabled under the terms of the Plan during the claim period.  *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. Jan. 5, 2011).

B.      Analysis

11.     The question before the Court is whether Plaintiff was disabled from performing her regular occupation under the applicable MetLife long-term disability plan.  Under the Plan, in order to receive benefits, Plaintiff must be "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue [her] Usual Occupation in the usual and customary way."  (AR 2311.)  Plaintiff must be continuously disabled for the 180-day Elimination Period before benefits will begin.  Defendant asserts that Plaintiff's Elimination Period spanned from March 24, 2013 to September 20, 2013, and Plaintiff does not refute this assertion.  Therefore, the Court must determine whether Plaintiff was unable to perform the substantial and material acts necessary for her occupation from March 24, 2013 through September 20, 2013.  Defendant contends that, while Plaintiff may have some medical

impairments, she "cannot prove that she has functional impairments that rise to the level of a disability under the Plan's terms." (ECF No. 49 at 24.)  However, the Court finds the preponderance of the evidence supports the conclusion that Plaintiff was disabled from her regular occupation during the Elimination Period.

12.    Plaintiff's medical records show the deterioration of Plaintiff's physical health and abilities over the course of the Elimination Period and thereafter.  Ultimately, her treating physicians resolved that Plaintiff could not sit for more than two non-continuous hours per day and she could not stand on her own.  These restrictions ensured that Plaintiff could not perform her duties as a Human Resources Compliance Specialist, which required her to sit at a computer for approximately 98 percent of her eight-hour work day.

13.    **Plaintiff's back pain:** The record shows that Plaintiff experienced a significant increase in her low back pain in February 2013, which caused her to seek medical attention.  Her condition persisted despite physical therapy treatment and Plaintiff ceased attending work because of her pain after March 23, 2013.  During the Elimination Period, Plaintiff was examined by several doctors who all performed objective tests including an MRI that confirmed a diagnosis of radiculopathy, myosis, a sprain or strain of the lumbar spine, and degenerative disc disease.  Dr. Han diagnosed Plaintiff with a diffuse disc bulge in her L5-S1 vertebral space with correlated nerve encroachment.  Dr. Warbritton performed objective tests that corroborated Plaintiff's report of low back pain and kept Plaintiff out of work beginning on April 10, 2013 and continuing for the remainder of the Elimination Period.  The notes indicating that Plaintiff should remain off work included ratings of Plaintiff's pain on a 1–10 scale.  Plaintiff's pain, caused by her diffuse disc bulge, made her unable to sit for the amount of time required by her job.  Therefore, Plaintiff is unable to perform "with reasonable continuity" the substantial and material acts necessary to her occupation.  Plaintiff underwent ongoing treatment for her back pain for the entirety of the Elimination Period.  She regularly consulted with Dr. Warbritton and received lumbar steroid injections in an attempt to relieve her pain and return her to a functional status.  None of Plaintiff's doctors indicated that they believed she was exaggerating her pain levels or that she showed signs of being a malingerer.  In an attempt to refute Plaintiff's claim that she was unable

to work due to pain, Defendant cites Dr. Hinrichs's report in which Dr. Hinrichs opined that Plaintiff's conditions should not have caused her enough pain to hamper her ability to work a sedentary job. However, this report does not assert or establish that it is impossible for a patient with conditions such as Plaintiff's to experience a debilitating amount of pain. Nor does the report coincide with any opinions on the part of Plaintiff's treating doctors that would call Plaintiff's reports of pain into question. Dr. Chiang, Plaintiff's treating doctor since 2010, wrote an opinion letter which refuted Dr. Hinrichs's position and corroborated Plaintiff's reports of pain and her inability to perform her occupation due to her back pain. Per Dr. Chiang's opinion, Plaintiff was disabled and unable to perform her duties beginning in March 2013 and continuing through the date of the letter. Plaintiff's medical records support a finding, by the preponderance of the evidence, that Plaintiff was disabled continuously throughout the Elimination Period due to her back pain.

14. **Plaintiff's heel pain:** After the Elimination Period ended, Plaintiff's physical complaints increased. She began seeing Dr. Tom for pain in her left heel. Plaintiff was treated with a CAM walker and a hard cast. At times, her pain improved. However, over time, her pain increased. Ultimately, Dr. Chiang opined that Plaintiff was unable to stand on her own.

15. **Weight afforded various doctors:** Defendant relies almost exclusively upon the reports of its Nurse Consultant, Nurse Bachner, and IPC, Dr. Hinrichs, to refute the opinions of Plaintiff's other treating physicians. However, Nurse Bachner and Dr. Hinrichs only performed paper reviews of Plaintiff's medical records and neither observed nor treated Plaintiff personally. While Defendant is correct in its assertion that treating physicians are not accorded any special deference in ERISA cases, the Court may still evaluate the relative weight of reviewing physicians based on their opportunity to evaluate the plaintiff. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (medical opinions rendered after in-person examination more persuasive that contrary opinions rendered following paper-only review of records); *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 942 (N.D. Cal. 2019) ("While deference is not necessarily owed to treating physicians in ERISA cases, conclusions drawn at the end of in-person medical examinations are inherently more helpful because the physician

observes and interacts with the patient for several minutes at a time"). "A treating physician's opinion may merit less weight where, for example, the relationship between the claimant and the physician has been 'of short duration' or where a non-treating specialist has pertinent expertise that the treating physician lacks." *Filarsky*, 391 F. Supp. 3d at 939. The weight given to an examining doctor's conclusions and diagnosis is based upon: "(i) the extent of the patient's treatment history; (ii) whether the examining physician specializes in the condition at issue; and (iii) how much detail the examining physician provides to support his conclusions." *Id.* at 940.

16. In this case, Plaintiff's treating physicians, Dr. Han, Dr. Warbritton, Dr. Chiang, Dr. Tom, and Dr. Sautter have long histories of treating Plaintiff for her numerous ailments. Over the years, they were able to interact with Plaintiff and make observations as to her functionality, pain levels, and ability to work. All these doctors were working towards her recovery and made notes reflecting fluctuations in her status. The opinion letters written by Dr. Warbritton and Dr. Chiang were detailed and based upon their personal observations of Plaintiff as well as her medical records from other doctors. Dr. Han had the benefit of treating Plaintiff almost from the onset of her back injury and interpreted her 2013 MRI. Dr. Tom likewise treated Plaintiff over an extended period of time for her heel pain and saw in real time her improvements and deteriorations. He and Dr. Sautter were specialists in podiatry and Dr. Sautter recommended Plaintiff for surgery for her heel pain. The Court finds these doctors' opinions to hold significant weight in determining Plaintiff's ability to qualify for benefits under the Plan.

17. Dr. Atienza, Dr. Ekanayake, Dr. Douglas, Dr. Lippert, and Dr. Tarasula all only treated Plaintiff briefly. Dr. Atienza saw Plaintiff at the onset of her back pain and prescribed conservative treatments. Dr. Ekanayake and Dr. Douglas saw Plaintiff for her heel and foot pain and noted their impressions of her condition at that time. Dr. Lippert and Dr. Tarasula treated Plaintiff after her car accident and were most focused on her resulting injuries from that incident, not the conditions underlying her disability claim. These doctors' opinions and observations are given weight comparable to the amount of time spent with the Plaintiff and their focus and specialized knowledge regarding her conditions.

///

18.     Of the medical practitioners referenced in the record, Nurse Bachner and Dr. Hinrichs — both hired by MetLife — were the only ones to submit an opinion without interacting with Plaintiff in person.  Based on her initial review of Plaintiff's medical records, Nurse Bachner was unable to determine initially whether or not Plaintiff's medical records supported her claim of disability.  Therefore, Nurse Bachner attempted to collect additional information from Plaintiff's treating doctors but was more or less unsuccessful.  From the information available to her and the responses — or the lack of response — to her request for additional information, Nurse Bachner determined that Plaintiff did not qualify for benefits under the Plan.  Nurse Bachner's credentials also require the Court to afford her opinion with less weight as she is not a physician and it is unclear whether she has any specific area of expertise.  Dr. Hinrichs also based his opinion on a paper review of Plaintiff's medical records and, unlike Nurse Bachner, did not attempt to contact any of Plaintiff's treating doctors for further information.  These opinions based on paper reviews carry less weight than those based on personal interaction with Plaintiff.  This especially holds true when the opinion of the paper reviewer reaches the opposite conclusion than those of the treating doctors.

19.     **MetLife's reliance on Dr. Hinrichs:** In its denial of Plaintiff's benefits, Defendant relies heavily on Dr. Hinrichs's report to support its denial of benefits.  However, Dr. Hinrichs's report does not in fact refute the positions of Plaintiff's treating doctors.  Moreover, his conclusions as to Plaintiff's limitations regarding her ability to work are not well-supported.  Specifically, Dr. Hinrichs initially finds that "[t]he medical record is supportive of physical impairment primarily for chronic low back pain and lumbar strain/sprain with lumbar spondylosis as well as plantar fasciitis."  (AR 139.)  This is consistent with the findings of Plaintiff's treating doctors.  However, thereafter, Dr. Hinrichs opines that various activities would be appropriate for Plaintiff, given she suffered from these conditions.  Yet Dr. Hinrichs does not point to Plaintiff's specific complaints, nor to the portions of her medical records that would support the specific restrictions he indicates are appropriate for her.  Instead, Dr. Hinrichs appears to set forth as opinion the generalization that a person with Plaintiff's conditions would be so limited or so able.  This is not a well-supported conclusion as Defendant contends.  Indeed, Dr. Hinrichs simply

1    summarized the medical records he reviewed and then made a conclusion.  He did not indicate

2    which medical records supported his conclusion that Plaintiff should be able to perform her

3    sedentary occupation, nor did he comment on Plaintiff's subjective report of pain and her inability

4    to sit for any extended period of time.

5            20.    Dr. Hinrichs submitted a supplemental report after reviewing additional records,

6    including opinion statements written by Dr. Chiang.  According to the supplemental report, the

7    additional records did not substantially change Dr. Hinrichs's opinion, but he did indicate that "it

8    would be appropriate to allow the claimant to sit for a half an hour at a time with a 5 minute [sic]

9    break to stand and stretch."  (AR 48.)  Not only does Dr. Hinrichs fail to support this restriction

10   with specific reference to the medical record, he also completely disregards the notations in

11   Plaintiff's records that she is unable to stand unassisted.  Indeed, Dr. Hinrichs makes a point of

12   stating that he does not "believe the medical information as presented is objectively supporting of

13   impairment or restrictions."  (*Id.*)  These statements, coupled with the information Dr. Hinrichs

14   included from Plaintiff's medical records in his initial report, suggest that Dr. Hinrichs

15   disregarded Plaintiff's subjective reports of pain and only focused on what he deemed to be

16   "objective."  Dr. Hinrichs does not dispute that Plaintiff suffers from the conditions that she

17   alleges; he only disputes her reported pain levels and limitations.  In support of this opinion, Dr.

18   Hinrichs references an "essentially normal EMG" but fails to note that the EMG is from 2010,

19   long before Plaintiff's symptoms required her to stop working.  Dr. Hinrichs also opines that

20   "MRI findings are notoriously poor at correlating with a patient's symptoms."  (*Id.*)  He does not,

21   however, state that a disc bulge such as Plaintiff's cannot cause the level of pain Plaintiff

22   reported.  Rather, Dr. Hinrichs merely states it can be difficult to assess the pain level of a patient

23   solely from review of an MRI.  Given this opinion, it is surprising and questionable that Dr.

24   Hinrichs did not recommend he conduct an examination of Plaintiff in person.  Indeed, if Dr.

25   Hinrichs had any doubts as to the extent of Plaintiff's limitations, the more prudent course of

26   action would have been to conduct his own in-person examination of Plaintiff, then derive his

27   medical opinions from personal interactions with Plaintiff.  Instead, Dr. Hinrichs based his

28   opinion on the general assertion that "a full one third of all adults age 65 and above have

significant abnormalities on MRI without symptoms." (*Id.*) This statement does nothing to indicate what *Plaintiff's* symptoms are from her documented MRI abnormality, nor does it refute the assertion that Plaintiff's symptoms could be as severe as she and her treating doctors report. Thus, Dr. Hinrichs, and by extension Defendant, completely disregarded Plaintiff's reported pain levels and limitations and encourages the Court to do the same.

21.     **Weight of subjective reports of pain:** Defendant does not dispute that Plaintiff has a medical condition.  Instead, it argues that the presence of a verifiable medical condition alone does not mean that an individual is disabled under the Plan.  Rather, Defendant argues Plaintiff must show both that she has a medical condition and that the condition is disabling.

22.     Defendant further argues that Plaintiff's subjective reports of pain alone cannot establish disability where other evidence in the record supports a finding that she is able to work. Defendant bases this contention on a case from the Central District of California, *Seleine v. Fluor Corp. Long-Term Disability Plan*, arguing *Seleine* is analogous to the instant matter.  *Seleine*, 598 F. Supp. 2d 1090, 1097 (C.D. Cal. 2009), aff'd, 409 F. App'x 99 (9th Cir. 2010).  However, *Seleine* is easily distinguished and, as Plaintiff correctly points out, it would be an abuse of discretion for the Court to fail to consider Plaintiff's subjective account of pain.  *Kibel v. Aetna Life Ins. Co.*, 725 F. App'x 475, 477 (9th Cir. 2018) (citing *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th Cir. 2016)).

23.     *Seleine* is distinguishable in several ways.  First, it was decided under the abuse of discretion standard, not the *de novo* standard that applies here, and is therefore only helpful to a point.  *Filarsky*, 391 F. Supp. 3d at 941–42 ("the reviewing court evaluated whether the insurer's decision was arbitrary and capricious—not whether the decision was correct.  A reasonable conclusion (one free of arbitrariness and caprice) may in some cases be incorrect; therefore, such cases are helpful only to a point when reviewing [defendant's] denial of coverage.") (internal citations omitted).  Next, and most importantly, in *Seleine*, the defendant ordered a number of exams, including a Functional Capacity Evaluation and surveillance during its initial review of the plaintiff's case, and an IME as part of the appeal.  All these exams provided evidence that the plaintiff could perform her work and contradicted the plaintiff's subjective assertion that her pain

levels prohibited her from working. Further, the treating physician's assessments conflicted with the plaintiff's subjective symptoms and there were no objective changes in the plaintiff's condition over the years which would have resulted in a sudden change in pain level and ability.

24. Here, by contrast, Plaintiff's treating physicians recorded her subjective complaints as well as objective test results and observations, such as the regular positive Straight Leg Raise test and observations including Plaintiff's struggles to stand, arrival in a wheelchair, and difficulties moving to the exam table. These objective observations support Plaintiff's description of the intensity of her pain. Additionally, Plaintiff's 2013 MRI indicated a substantial change from her 2011 MRI. Similar to the plaintiff in *Seleine*, Plaintiff had a history of low back pain before her application for LTD benefits but was still able to work until that point. However, in *Seleine*, there was no objective change in the plaintiff's condition which would indicate an increase in her pain and a change in her ability to work. Plaintiff's 2013 MRI in this case, however, shows a substantial change from her 2011 MRI, which accounts for her change in status.

25. **Failure to order an examination:** While independent examinations are not required by the Plan, they are available to MetLife when there is a question as to the claimant's eligibility. The absence of an independent examination in this case raises significant questions, especially because MetLife relies primarily on the paper review of Dr. Hinrichs. It would be inappropriate for the Court to disregard Plaintiff's reported pain levels in light of only a paper review. "[A] plan should not require a claimant to provide objective proof of his pain level and [] a plan should not reject subjective claims of excess pain based solely on a paper review's observation that a physical impairment should not cause the claimant as much pain as he was reportedly suffering." *Demer*, 835 F.3d at 906 (citing *Montour*, 588 F.3d at 634). As discussed above, Dr. Hinrichs does not refute that Plaintiff has a condition which can cause pain; he only concludes that Plaintiff's condition should not cause her pain raising to the level of a disability. Plaintiff's medical records and the opinions of her treating doctors corroborate her claim that she is unable to sit or stand for a sufficient amount of time to perform the duties of her sedentary occupation. The Court finds MetLife's failure to order an examination of Plaintiff as part of its

initial determination or appeal to be suspicious, especially because it concedes that Plaintiff has a medical condition. A single in-person examination would have gone a long way in allowing MetLife to assess Plaintiff's credibility and level of pain.

26. The Court acknowledges the difficult task of administrators who must weigh evidence as they receive it and determine the credibility of disability claimants. For example, the Court acknowledges that records of Plaintiff's numerous medical visits may not have been available immediately to MetLife during its initial claim review. Nevertheless, because this Court reviews MetLife's determination of disability *de novo*, rather than for an abuse of discretion, the timing of disclosure of records does not affect the Court's analysis. Despite this difficulty for administrators, the Court finds Plaintiff to be a credible witness. Plaintiff worked for years with back pain and only ceased working after the pain increased substantially. Further, Plaintiff attempted to return to work and did so successfully for just under six months, despite the onset of additional debilitating medical conditions. Even when her pain proved too intense to continue work, Plaintiff did not initially seek LTD benefits retroactively to March of 2013 but sought to file a new claim beginning July 23, 2014. It was only due to MetLife's policy limitations that Plaintiff was required to appeal her initial claim instead of filing a new one. Plaintiff is precisely the employee to whom ERISA should apply. *See Conkright*, 559 U.S. at 516–17 ("Congress enacted ERISA to ensure that employees would receive the benefits they had earned[.]") (internal citations and quotation marks omitted).

27. **SSA decision:** The SSA decision was not available to MetLife at the time of its initial determination or Plaintiff's appeal. Nevertheless, the Court may still consider it here as the parties stipulated to its inclusion in the administrative record and the Court is reviewing this matter *de novo*. (ECF Nos. 37, 42.) Further, while the SSA decision is not determinative, it is persuasive and, under an abuse of discretion review, the failure to differentiate a contrary conclusion by the SSA can be indicative of such an abuse of discretion. *See Montour*, 588 F.3d at 635. The SSA found Plaintiff disabled under its standard — the "inability to engage in any substantial gainful activity by reason of any medically determinable physical ... impairment" that is of "such severity that [the claimant] ... cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives." 42 U.S.C. §§ 423(d)(1)(A), (2)(A). However, the SSA, at the time of its decision, was bound by the treating physician rule, which affords "special weight" to the opinions of the claimant's treating physician (*see* 20 CFR §§ 404.1527(d)(2), 416.927(d)(2)), whereas ERISA administrators are not. This Court made determinations finding the opinion of MetLife's hired consultants less persuasive than those of Plaintiff's treating doctors, not under the treating physician rule, but because MetLife's consultants did not evaluate Plaintiff in person.

28.     Upon review of the SSA decision, it appears that, unlike this Court, the administrative law judge ("ALJ") gave equal weight to Dr. Hinrichs and Plaintiff's other doctors because the ALJ misidentified Dr. Hinrichs as a treating physician. Nevertheless, even giving this greater weight to Dr. Hinrichs's report, the SSA still found Plaintiff disabled under its standard. This further supports Plaintiff's position that she was disabled from her occupation under the Plan. The SSA decision is one more piece of evidence showing that Plaintiff was disabled at least as early as April 7, 2014. For the reasons discussed above, the Court finds that Plaintiff was disabled under the Plan beginning on March 24, 2013. The SSA's decision and the medical records showing that Plaintiff's conditions worsened over time further supports the Court's finding that Plaintiff was disabled under the Plan.

29.     **Pre–Judgment Interest:** A district court may award prejudgment interest on an award of ERISA benefits in its discretion. *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 627–28 (9th Cir. 2007). "Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001) (quoting *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1391 (9th Cir. 1994)). Here, the parties have provided no information, let alone substantial evidence, with respect to the interest rate and Plaintiff has not made any argument to support her request for ten percent under Cal. Ins. Code § 10111.2 as opposed to the federal standard; therefore, the pre-

judgment interest rate shall be set at the interest rate prescribed in 28 U.S.C. § 1961.

30.     **Remand:** Defendant requests in its responding trial brief that the Court remand the action back to the administrator to determine whether Plaintiff is disabled under the more expansive definition of any gainful occupation.  (ECF No. 51 at 24 ("If the Court determines that [Plaintiff] was entitled to benefits, her recovery would be limited to the initial 24-month period, and the case would then be remanded for MetLife to determine whether she qualifies for benefits under the Plan after 24 months.").)  While Plaintiff did not have the opportunity to respond to this request directly, she did not make any specific argument in her briefs as to why she was entitled to benefits past the initial 24-month period.  Further, Ninth Circuit authority is clear on this matter.  *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) (finding that because the defendant never had an opportunity to decide the plaintiff's case under the "any occupation" standard, the district court erred in granting benefits past the initial 24-month period based on the "own occupation" standard); *see also Hantakas v. Metro. Life Ins. Co.*, No. 2:14-CV-00235-TLN-KJN, 2016 WL 374562, at *7 (E.D. Cal. Feb. 1, 2016) (same).  Because the administrator has not had the opportunity to consider whether Plaintiff is disabled under its definition for any gainful occupation, the Court agrees that remand is appropriate.  Accordingly, the remainder of Plaintiff's claim is REMANDED for MetLife to determine whether Plaintiff can perform the material duties of any gainful occupation.

## III.     CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff was Totally Disabled within the meaning of the Plan as of the beginning of the Elimination Period, March 24, 2013, and was entitled to long-term disability benefits for the initial 24-month period.  MetLife now must determine whether Plaintiff is entitled to benefits under the "any occupation" standard.  This case is REMANDED for the limited purpose of enabling MetLife to make that determination.

The parties shall meet and confer as soon as practicable and shall provide the Court with an accounting to determine the amounts owed to Plaintiff in a Proposed Amended Judgment to be filed within 14 days of entry of this Findings of Fact and Conclusions of Law.

///

1       IT IS SO ORDERED.

2  Dated:  March 23, 2020

Troy L. Nunley
United States District Judge